I respectfully dissent from that portion of the majority opinion concerning its tracing analysis. While the majority initially acknowledges that tracing can be offset by evidence of donative intent, its ultimate conclusion was that "[t]he primary focus when determining whether separate property has become marital is traceability." With all due respect, I believe this to be an overly broad statement of the law.
The central point of the majority's conclusion is that if commingled assets can be traced, such tracing overrides the ability of a spouse to gift or contract away non-marital property to a spouse. This "all or nothing" interpretation is incompatible with the other relevant statutes and completely ignores the ability of a husband and wife to contract with or gift each other during the marriage. See R.C. 3103.05 and 3105.171(A)(6)(a)(vii).
Further, the majority holds that even if gifting could prevail over traceability, it would not have reached the same factual conclusion as the trial court in terms of whether there was a gifting. Instead, the majority, primarily, relies on appellant's testimony at trial that he intended to maintain his assets as his separate assets. However, the trial court determined that appellant's self-serving statement was at odds with his behavior, as the trial court found that appellant had treated his infusion of separate assets as marital assets from the beginning of the marriage. Thus, the trial court concluded that a gift had been intended and made.
The record demonstrates that there were serious issues of credibility between appellant and appellee. The trial court resolved them in favor of appellee. The possibility that the majority may disagree with the trial court's factual findings is an insufficient reason to reverse on that basis. Great deference is to be accorded the trial court on these factual decisions. C.E. Morris Co. v. Foley Constr. Co. (1978), 54 Ohio St.2d 279;Barkley v. Barkley (1997), 119 Ohio App.3d 155, 159.
A review of the record shows that there was competent, credible evidence to support the trial court's determination that the properties were marital in nature. For example, appellant was admittedly a recipient of a significant trust during most of his adult life. Thus, he would have had a better than average knowledge of how to protect assets. He was admittedly experienced in conducting sophisticated financial transactions, including land purchases. In fact, when questioned at trial, appellant responded that he was aware of the significance of a title held jointly with right of survivorship. Further, it is irrelevant that appellant now claims he did it for probate reasons, as he admitted he was aware that such title gave appellee a present interest in the property:
 "Q. [by appellee's attorney on cross-examination] Well, she [appellee] would have a present interest, and then if you died she would get the entire property?
"A. That's right.
"Q. And you understood that, correct?
"A. Yes, that's correct."
 Subsequently, on direct examination, appellant's attorney tried to rehabilitate appellant's testimony with the following exchange:
 "Q. Did you understand at that time what a joint and survivorship deed was?
"* * *
 "Q. What was your intent when you took title to the property in whatever form you took it?
 "A. The intent was to allow upon my death the transfer of that particular property free and clear to my wife in the event that I passed away before her. That was the intent of the survivorship. Otherwise, it was to be my personal investment."
In addressing a similar argument in Helton v. Helton (1996),114 Ohio App.3d 683, the Second Appellate District reaffirmed its holding in an earlier case:
 "`We are mindful of R.C. 3105.171(H), that provides that the holding of title by one spouse individually or by both spouses in a form of co-ownership does not determine whether the property is marital or separate property. Here, however, the evidence [of a joint and several with right of survivorship title] presented more than a mere form of ownership. It demonstrated a transaction entered into to accomplish a specific object; avoidance of expense that would otherwise accompany the death of either Mr. Wolf or his mother. This benefit could not be achieved without Mr. Wolf and his mother giving the plaintiff Mrs. Wolf an interest in the property.'" (Emphasis added.) Helton
at 687, quoting Wolf v. Wolf (Sept. 27, 1996), Greene App. No. 96 CA 10, unreported, 1996 WL 563997.
In the instant case, appellant's claim on redirect examination that he intended his investment in the Chardon property to remain as separate property was negated, among other reasons, by his admission that he understood that this form of title was required to achieve the probate result he wished. Unless appellee was shown to be in agreement with appellant's "secret" intent, appellant was actually claiming he defrauded appellee. After all, she testified her understanding was that "the land would be for both of [them] * * *." I doubt that appellant really understood the implications of his rebuttal testimony.
Nevertheless, the trial court understood perfectly how inconsistent appellant's testimony was. In light of that, the court chose only to believe appellant's admission that he understood the use and significance of a joint and survivorship title; and, that he could not use such a title without vesting his spouse with a present interest. The fact that appellant may not have wanted to give such an interest to his wife is irrelevant. Any duress which appellant felt could only fall far short of what was needed to invalidate his action in vesting appellee with a one-half interest in marital property.
Such an analysis is not in conflict with R.C. 3105.171. If title itself is not determinative, then, it is the surrounding circumstances which are now determinative of the significance of the title form. Did the litigant demonstrate his or her awareness of the legal significance of one form of title over another? Did the litigant behave in a manner consistent with the title form chosen? Did the opposing litigant behave in a manner consistent with the title form? The trial court's determination that the evidence supported an intent to exercise joint and several ownership from the beginning is, indeed, supported by the record.
Another issue that needs to be addressed is the implication of appellee's testimony that consideration was exchanged between appellant and appellee. Married couples have long had the right to gift or to contract with each other during the marriage as long as the contract did not impact the marriage relationship itself. R.C. 3103.05 states in relevant part:
 "A husband or wife may enter into any engagement or transaction with the other, * * * which either might if unmarried; subject, in transaction between themselves, to the general rules which control the actions of persons occupying confidential relations with each other."
 If believed, appellee's testimony, arguably, sets out the elements of a contract. Specifically, the joint titling took place in exchange for her financial liability exposure; thus, there was a clear exchange of consideration. This was evidenced by appellee's testimony wherein she stated that the reason she insisted that title be taken as joint and several with right of survivorship was because she was to incur financial liability:
 "Q. And did you discuss this with [appellant] vis-à-vis the land that you were buying?
"A. Yes.
"Q. And what did you discuss?
 "A. That the land would be for both of us if I was [sic] paying the taxes on it with him.
 "Q. You said, the land would be for both of us, correct?
"A. Yes.
"Q. What did [appellant] respond to that?
"A. That he had no problem with that."
 Similarly, in regards to the animal hospital, appellee testified as follows:
 "Q. And did [appellant] ever discuss with you [sic] characterization of that asset, the animal hospital and the land upon which it was situated?
 "A. I thought it was a mutual holding. I thought it was for both of us.
 "Q. And what led you to believe you thought it was for both of you?
 "A. I think the [sic] way the deed was when I saw it and helped sign for it, and I supported us for the two years while he paid it off. He didn't have to bring money home from the business. I could pay all the bills * * *."
Appellee further testified that she knew she would help pay the tax liability incurred from appellant's down payment. Later, when the parties decided to build a residence on the Chardon property, appellee was a co-signor on $400,000 of related financing, as well as a co-signor on all the other mortgages secured on the various properties. In exchange for incurring such liability, appellee would retain a one-half interest in the property, thereby making the property marital in nature. Arguably, this was more than a gift; it was an exchange for consideration.
Given that this specific issue was never precisely raised on appeal, I return to the issue that, minimally, a gifting was intended. Prior to the enactment of R.C. 3105.171, commingling, by itself, was regularly viewed as being sufficient to transmute separate funds into marital funds, without any need to show a gift or contract. In effect, commingling resulted in transmutation, regardless of any ability to trace the funds.Black v. Black (Nov. 4, 1996), Stark App. No. 1996CA00052, unreported, 1996 WL 752885, at 2-3.
However, the revised attitude expressed towards commingling and traceability in R.C. 3105.171(A)(6)(b) and titling in R.C. 3105.171(H) did not replace section (A)(6)(a)(vii) of R.C. 3105.171 dealing with gifting and R.C. 3103.05 concerning contracts between spouses. Hence, the commingling, tracing and titling sections of R.C. 3105.171 must be read in harmony with the gifting section and the contract statute. In doing so, one must acknowledge that it is still possible, under the appropriate circumstances, to transfer non-marital funds to a spouse through a contract or gift, regardless of traceability. See, e.g., Letson v.Letson (Sept. 30, 1997), Trumbull App. No. 95-T-5356, unreported, 1997 WL 663514, at 6 (holding that "[a] review of the relevant case law reveals that the effect of R.C. 3105.171(H) `is to negate the presumption of a gift, but not to preclude such a finding upon an appropriate factual context.'").
The majority claims that the trial court never actually held that appellant gifted appellee his non-marital property. I disagree. In paragraph forty of the September 27, 2000 findings of facts and conclusions of law judgment entry, the trial court cited the statute on gifting and then cited a number of relevant cases with similar facts where gifting was found. Immediately thereafter in the same paragraph, the court determined that all of the disputed property was marital in nature.
I believe that the trial court was on the right track in its reasoning that the actions of appellant were consistent in that he treated the property as marital property from the beginning. Specifically, the court found that all the properties were titled in joint and several ownership with right of survivorship; that appellee incurred tax liability on the down payment; that appellee was subsequently liable on the numerous loans and mortgages; that appellee contributed in numerous ways to payment and upkeep on these properties; that the proceeds from the sale of a portion of the Chardon property were untraceable and commingled; that the parties' funds were jointly used to pay off these debts; and that appellant never attempted to segregate his assets until the divorce. No one factor by itself might have been enough; however, together they overwhelmingly support the trial court's determination that appellant intended to gift appellee with his separate assets throughout the marriage.
In summation, the pronouncement of this case should be that, while the holding of title is not dispositive of whether property is separate or marital, neither is the traceability of commingled assets dispositive ifthere has been a clear and convincing showing that there has been anexchange for consideration or a gift. There is simply no other statutory interpretation possible which can allow all of the various code sections to be read harmoniously.
Finally, I feel compelled to address another issue which neither party has raised, but which begs to be addressed: Is R.C. 3105.171(A)(6)(b) retroactive? If the majority is correct in its analysis, appellee will be deprived of property interests she acquired, beginning at the time the Chardon deed was signed in 1981, by the retroactive application of R.C.3105.171(A)(6)(b).
With respect to this point, the Supreme Court of Ohio has determined that "there is no language in [R.C. 3105.171] that supports the conclusion that the General Assembly intended [the statute] to apply retroactively." Schulte v. Schulte (1994), 71 Ohio St.3d 41, 45. From this, the court concluded that "R.C. 3105.171 applies prospectively only to those divorce cases filed after its effective date, January 1, 1991."Schulte at 45.
At the outset, it appears that R.C. 3105.171 is applicable given that appellee filed a complaint for divorce in 1998. Although I agree with the limited holding in Schulte, I believe that it does not address the precise issue in this case, to wit: whether R.C. 3105.171(A)(6)(b) is applicable to situations where property rights were vested prior to its enactment? For the reasons that follow, I believe the majority inappropriately applied R.C. 3105.171(A)(6)(b) and its concept of tracing retroactively to the instant cause. Rather, I posit that the law in effect at the time appellee's property rights vested should be employed.
As previously mentioned, I contend that an exchange for consideration and/or gifting occurred in this case. In either instance, appellee immediately acquired a vested property right in the Chardon property. "`When a contract is once made, the law then in force defines the duties and rights of the parties under it.'" Ross v. Farmers Ins. Group ofCompanies (1998), 82 Ohio St.3d 281, 287, quoting Goodale v. Fennell
(1875), 27 Ohio St. 426, 432. The same logic would clearly apply to a completed gift. If a statute were applied to a contract that was entered into before the effective date of the statute, "`[it] would essentially change the contract which existed prior to the effective date of the statute.'" Ross at 288, quoting Aetna Life Ins. Co. v. Schilling (1993),67 Ohio St.3d 164, 167. Again, the same can be said for a gift.
The above proposition of law is also emulated in Section 28, Article II
of the Ohio Constitution, which provides that "[t]he general assembly shall have no power to pass * * * laws impairing the obligation of contracts."
With these concepts in mind, I believe that R.C. 3105.171(A)(6)(b) is not applicable to appellee as her property rights were vested prior to the enactment of this statute. To now apply R.C. 3105.171(A)(b)(6) retroactively would inequitably destroy appellee's vested property rights. See, e.g., Kiser v. Coleman (1986), 28 Ohio St.3d 259, 263
(holding that the retroactive application of statutory provisions to land installment contracts that were entered into before the effective date of the statute violated Section 28, Article II of the Ohio Constitution, as applying the statutes would destroy the vested rights of the contracting parties). Rather, the law in effect at the time appellee retained her vested property interest should determine her rights.
Prior to the enactment of R.C. 3105.171, the concept of transmutation by commingling was alive and well, despite any ability to trace assets. In fact, trial courts were to consider the following factors in determining the transmutation of separate property into marital property: "(1) the expressed intent of the parties insofar as it could be reliably ascertained; (2) the source of the funds, if any, used to acquire the property; (3) the circumstances surrounding the acquisition of the property; (4) the dates of the marriage, the acquisition of the property, the claimed transmutation, and the breakup of the marriage; (5) the inducement for and/or purpose of the transaction which gave rise to the claimed transmutation; and (6) the value of the property and its significance to the parties." Frederick v. Frederick (Mar. 31, 2000), Portage App. No. 98-P-0071, unreported, 2000 WL 522170, at 10. See, also, Kuehn v. Kuehn (1988), 55 Ohio App.3d 245, 246.[1]
Thus, it was the act of commingling, not tracing, which was determinative in addressing the issue of transmutation. Black at 3 (applying the doctrine of transmutation after the enactment of R.C.3105.171 and holding that "[t]he fact that property can be traced back to [a spouse] is not a factor the trial court should consider in addressing the issue of transmutation.").
In applying the foregoing to the case at bar, appellant clearly transmuted his separate property into marital property by knowingly and intentionally giving appellee a present interest in the purchase of the Chardon property, as well as the other properties, even if it was only for estate planning purposes. The evidence is consistent that appellant intended the conveyance of these property interests to act either as a gift or as an exchange for consideration. Further, these conveyances occurred irrespective of appellant's ability to trace his property.Black, supra.
Based on the aforementioned reasons, I respectfully dissent from the majority opinion and would affirm the judgment of the trial court.
[1] However, the enactment of R.C. 3105.171 and its concept of traceability, otherwise known as the "source of funds rule", virtually replaced the multi-factor rule of Kuehn and the doctrine of transmutation. Frederick at 10. See, also, 1 Baldwin's Ohio Practice, Domestic Relations Law (1997), 489, 497, Sections 12.4, 12.10.